UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   DEC 1 2 2013   ★

**LONG ISLAND OFFICE**

-----------------------------------------------------------X
MELANIE DONUS, individually and on behalf of
MICHAEL DONUS and DIMITRI DONUS and
DENISE STROPKAY, individually and on behalf
of DAYNA STROPKAY, and DIANE COLLINS,
individually and on behalf of KATIE COLLINS,

MEMORANDUM AND ORDER

                          Plaintiffs,

CV 13-0479

           -against-

(Wexler, J.)

GARDEN CITY UNION FREE SCHOOL
DISTRICT and the BOARD OF EDUCATION
OF THE GARDEN CITY UNION FREE
SCHOOL DISTRICT,

                       Defendants.

-----------------------------------------------------------X

APPEARANCES:

       THE LAW OFFICES OF STEVEN A. MORELLI, P.C.
       BY:   STEVEN A. MORELLI, ESQ.
       Attorneys for Plaintiff
       1461 Franklin Avenue
       Garden City, New York 11530

       RUTHERFORD & CHRISTIE LLP
       BY:   LEWIS R. SILVERMAN, ESQ.
              CAROLINE BETH LINEEN, ESQ.
       Attorneys for Defendants
       369 Lexington Avenue
       New York, New York 10017

WEXLER, District Judge:

     Before the Court is the Defendants' motion for a judgment on the pleadings, pursuant to

Federal Rule of Civil Procedure 12(c), seeking to dismiss this action in its entirety on the grounds

that the Court lacks subject matter jurisdiction over the claims and that Plaintiff's claims are barred by the applicable statutes of limitation. In the event that the Court does not grant Defendants' motion for a judgment on the pleadings, Defendants request that the Plaintiffs' claims be severed into separate and distinct actions, pursuant to Federal Rule of Civil Procedure 21. Plaintiffs oppose the motion.

## BACKGROUND

Plaintiffs are all parents of disabled children who attend or attended school in the Garden City Union Free School District (the "District"), which is overseen by the Board of Education of the Garden City Union Free School District (the "Board") (collectively, "Defendants"). The following facts are taken from the Plaintiffs' Amended Complaint, filed on June 5, 2013.

A.    <u>Dayna Stropkay</u>

At eight months old, Dayna Stropkay ("Dayna") was diagnosed as having cerebral palsy. (Am. Compl. ¶ 20.) When Dayna was seven years old, however, this diagnosis was changed to bilateral closed lip schizencephaly. (<u>Id.</u>) Dayna's condition renders her, for the most part, non-ambulatory, such that she uses a power wheelchair and can walk only very short distances with a walker. (<u>Id.</u>) Dayna also has visual and oral apraxia[1] and can only use her left hand.[2] (<u>Id.</u>) As a result of her condition, Dayna used assistive technology while enrolled in school, and required assistance with using the bathroom. (<u>Id.</u> ¶ 21.)

---

[1] Apraxia is a disorder of the brain and nervous system in which the person is unable to perform tasks or movements when asked, despite understanding the request and being willing to perform it. (Am. Compl. ¶ 20.)

[2] Dayna's right hand is an "assist" hand. (<u>Id.</u>)

Dayna began school in the Defendant District in 1998, at which time she was in the first grade. (Id. ¶ 22.) In 2004, Dayna's mother, Plaintiff Denise Stropkay ("Stopkay"), requested that Dayna be evaluated because the District insisted that Dayna could not perform Regents-level work, which Dayna felt she was able to do. (Id. ¶ 23.) The evaluations revealed that Dayna had a visual tracking problem and that her assistive technology was not supporting her need. (Id. ¶ 24.) As a result, Dayna was provided with a Mercury computer for her school work and a Kurzweil reader to assist with her visual tracking. (Id.)

In 2005, during the eighth grade, Dayna was transferred from an inclusion classroom to self-contained special education classes intended for students on track for a Regents diploma. (Id. ¶ 25.) During that school year, the District's Assistive Technology Consultant, Lorainne Henniger ("Henniger"), asked Stropkay whether she knew that Dayna was unable to read and advised Stropkay that she thought Dayna may be dyslexic. (Id. ¶ 26.) Stropkay requested remediation from the District, but the District refused, stating that Dayna was already receiving appropriate remediation in the special education classroom. (Id.) Dayna did not receive the requested remediation specific to reading until May of the eighth grade. (Id.)

In 2006, while Dayna was in ninth grade, she failed the Math Regents Competency Test ("RCT"). (Id. ¶ 27.) She was nonetheless advanced to the next level math class. (Id.) In January 2008, Dayna took the Math RCT again and failed for a second time. (Id.) As a result, Stropkay requested numerous accommodations and additional help for Dayna, all of which were denied by the District. (Id. ¶¶ 28-29.) Moreover, when Henniger spoke in favor of Dayna

receiving Academic Intervention Services ("AIS"),[3] Defendants advised her to "be quiet." (Id. ¶ 29.) Defendants never offered Dayna AIS or even informed Stropkay that such services existed. (Id. ¶ 39.)

In June 2008, Dayna was scheduled to take the RCT exams in math, science and social studies, as well as the social studies regents exam. (Id. ¶ 30.) At the beginning of the school year, it was agreed that language would be installed on Dayna's Mercury computer to assist her with the vocabulary for each of the courses. (Id. ¶ 31.) However, the language was never installed; nor was Dayna provided with review work for writing exam essays or given any help practicing Document Based Questions. (Id. ¶¶ 31-32.) As a result, Dayna failed all of the RCTs. (Id. ¶ 33.)

On September 10, 2008, Stropkay contacted the NYSED and was advised that since Dayna failed the RCTs and other exams, she should have been provided with AIS. (Id. ¶ 38.) Despite the fact that AIS were offered every other day by the District as of September 2008, neither Dayna nor several other students with disabilities who qualified for the program were offered the services. (Id. ¶ 40.) As a result of the District's failure to provide Dayna with AIS, Stropkay contacted the NYSED again and complained. (Id. ¶ 41.)

In or around the same time, the District's Committee on Special Education ("CSE") urged that Dayna be downgraded from a Local Diploma track to an Individualized Education Program

---

[3] AIS are academic remedial or support services which the New York State Department of Education ("NYSED") requires all New York school districts to make available for students who fail RCT exams. (Id. ¶ 39.)

("IEP") Diploma track.[4] (Id. ¶ 37.) On October 10, 2008, Stropkay received a letter advising that a CSE meeting was being convened to review Dayna's educational program. (Id. ¶ 43.) During the CSE meeting, several teachers expressed that Dayna could not perform the work required for a Local Diploma. (Id.) As a result, the CSE recommended transferring Dayna to an IEP Diploma track, while keeping her in the same classes. (Id. ¶ 44.) Stropkay refused to agree to the transfer. (Id. ¶ 48.)

Thereafter, in January 2009, Defendants falsely accused Dayna of being incontinent. (Id. ¶ 69.) The false accusations continued for months, occurring on almost a daily basis. (Id. ¶¶ 65-96, 109-11, 124-27.)

Defendants also attempted to prevent Dayna from attending field trips with her classmates. (Id. ¶¶ 52-53, 97, 136-39.) Specifically, in March 2009, Dayna's school planned a field trip to the Brooklyn Academy of Music, traveling via the Long Island Railroad. (Id. ¶ 52.) Defendants informed Dayna that she could not go on the field trip with the rest of her classmates, but would instead have to travel on a small handicap accessible school bus, accompanied by an aide. (Id. ¶ 53, 97.) When Dayna arrived at the Brooklyn Academy of Music, she was not permitted to meet up with the rest of her class and was forced to leave early. (Id. ¶ 97.)

On February 9, 2009, Dayna was downgraded to an IEP Diploma. (Id. ¶ 82.) As a result, Dayna was no longer provided any AIS and was instead placed into life skills. (Id.) In June 2009, Stropkay and Dayna entered into mediation with Defendants in an effort to have Dayna transferred back to a Local Diploma; however, Defendants refused. (Id. ¶ 131.)

---

[4] Students on an IEP Diploma track do not take Regents or RCT exams and are graded solely on how well they meet their IEP goals. (Id. ¶ 44.)

In September 2009, Dayna left the District and was placed at the Henry Viscardi School, where she remained until her graduation. (Id. ¶¶ 132, 145.) Through efforts by the Henry Viscardi School, Dayna was eventually transferred back to a Local Diploma track and did in fact graduate with a Local Diploma. (Id. ¶¶ 133-34, 145.) However, a few weeks prior to graduation, Stropkay learned from a friend that Dayna was required to sit for the Math Regents exam in algebra in order to receive a Local Diploma. (Id. ¶ 142.) The exam was due to be administered the following week and it had been six years since Dayna had taken an algebra course. (Id. ¶ 143.) At no point did Defendants ever notify Stropkay that Dayna needed to sit for the Regents exam in order to obtain a Local Diploma. (Id. ¶ 144.)

B.     Michael and Dimitri Donus

Michael Donus ("Michael") and Dimitri Donus ("Dimitri") are twins born in 2002, both of whom were diagnosed with Autism when they were three years old. (Id. ¶¶ 149, 152.) In addition, Michael suffers from severe anxiety and Dimitri was born with an Arnold Chiari malformation of the brain that impacts his neurological function and speech. (Id. ¶¶ 154, 241.)

In 2003, both Michael and Dimitri began receiving Early Intervention Services ("EIS") at their home. (Id. ¶ 149.) When they were two years old, Michael and Dimitri began attending a Special Education Program provided by the District. (Id. ¶ 150.) At that time, their mother, Plaintiff Melanie Donus ("Donus"), requested additional services for her children, but her request was denied by Defendants. (Id. ¶ 151.) As a result, Donus filed for a Due Process hearing to obtain four additional hours of services per child. (Id.) Thereafter, Defendants granted Donus the additional services at a resolution meeting held in lieu of the Due Process hearing. (Id.)

From 2004 through 2006, Michael and Dimitri received full-time special education through a preschool program in addition to their at-home services. (Id. ¶ 152.) In 2006, Michael and Dimitri began school at Defendants' Locust Primary School. (Id. ¶ 153.)

      1.    <u>Michael</u>

      Michael's anxiety disorder is cyclical, such that he may go several weeks or months without exhibiting any anxious behavior. (Id. ¶ 154.) However, then he may regress, at which point an intensive behavioral plan is needed to help manage Michael's anxiety. (Id.) Specifically, Michael is overwhelmed by large crowds and unpredictable schedules. (Id.) While enrolled at Locust Primary School, Michael's behaviors included dropping to the floor, screaming, and running out of the classroom and into the school's courtyard. (Id. ¶ 155.)

For three years, Locust Primary School implemented only one Behavioral Intervention Plan ("BIP") for Michael. (Id. ¶ 155.) Defendants did not have a Board Certified Behavior Analyst ("BCBA"), who is qualified to assist with children with Autism, overseeing its behavioral plans. (Id. ¶ 156.) Rather, Defendants employed an under-qualified psychologist to address behavioral issues, who was only present in the classroom for one-half of one school day per week. (Id. ¶ 157.) As a result, Michael's parents were forced to pay for a BCBA themselves. (Id. ¶ 160.) However, Defendants refused to allow Michael's BCBA access to the school, thereby preventing Michael's behavioral plan from being consistent between both home and school. (Id. ¶ 161.)

In 2009, it was recommended that Michael be placed in an 8:1:1 (students: teacher: assistant) class at Stratford Elementary school in the District, a large building with approximately 800 students. (Id. ¶¶ 163-64.) After one month at Stratford Elementary, Michael began to

exhibit anxious behaviors similar to those he exhibited at Locust Primary school, including refusing to do work or listen to the teacher, throwing temper tantrums and dropping himself down to the floor, and crying hysterically, insisting that he wanted to go home. (Id. ¶¶ 164-65.) Michael also refused to attend his integrated classes with the general education students, such as gym, art and music class. (Id. ¶ 165.) Defendants' staff attempted to "push" Michael to attend the integrated classes, which only exacerbated his anxiety because the classes were in large rooms with between twenty and forty students. (Id. ¶ 166.)

During the 2010-2011 school year, Michael's behaviors worsened. (Id. ¶¶ 171-72.) Specifically, Michael developed an intense fear of the logo on the "Utz" brand snacks, which depicts a girl's face. (Id. ¶ 172.) Michael began to believe that the girl in the logo was real and refused to be in the vicinity of the product's packaging or people who were eating Utz snacks. (Id.) Defendants' staff were notified of Michael's fear but refused to include it in his IEP. (Id.) Rather, Michael's aide, Lorraine Schwartz, attempted to use the Utz logo as a reward and motivation for him to work, which only worsened Michael's fear. (Id. ¶ 174.) Staff members also consumed Utz snacks in front of Michael and teased him about his fear of the logo. (Id. ¶ 175.)

Over the course of the 2011-2012 school year, Michael began to exhibit symptoms of Obsessive Compulsive Disorder ("OCD"). (Id. ¶ 177.) Specifically, Michael became obsessed with a book that was kept at school and tried to take it home with him. (Id. ¶ 178.) When his teacher attempted to take the book from him, Michael pushed her, resulting in a "seclusion"

suspension[5] that lasted two days.[6] (Id. ¶ 178.) Following the suspension, Donus received a letter from the school's Principal, stating that, as a student with a disability, Michael was entitled to receive services during his suspension. (Id. ¶ 179.) However, no one from the District contacted Donus to arrange services until late in the afternoon on the last day of Michael's suspension.[7] (Id. ¶ 180.) Throughout the 2012-2013 school year, there were several instances in which general education students violated the District's Code of Conduct by engaging in "cyberbullying" or acting violently. (Id. ¶¶ 233-37.) These students, however, were not suspended or disciplined, whereas Michael was consistently suspended within hours of each of his violations. (Id.)

On January 14, 2013, Donus filed a notice with the District's Superintendent of her intent to instruct Michael at home. (Id. ¶ 226.) From January to June 2013, while he was being home schooled, the District failed to provide Michael with speech or occupational therapy that he was entitled to, pursuant to his IEP. (Id. ¶ 225.) In addition, Defendants failed to timely provide Donus with first or second quarter progress reports, as required by law, while Michael was receiving home instruction. (Id. ¶ 228.) Donus eventually received Michael's progress reports after requesting them; however, the first quarter report was ninety-five business days late and the

---

[5] A seclusion suspension meant that Michael was secluded from his classmates during the suspension. (Id. ¶ 178.)

[6] Michael was later suspended again for a similar incident in which he again pushed his teacher, this time for three days. (Id. ¶¶ 189-90.) Again, he received a seclusion suspension. (Id. ¶ 190.)

[7] Although required by law to provide services to students with disabilities during suspensions, the school's guidance counselor admitted that, in practice, it is not always able to do so as they are sometimes unable to find anyone to administer the services. (Id. ¶ 181.)

second quarter one was thirty business days late. (Id. ¶ 229.) The parents of the District's general education students, however, received their children's progress reports in a timely manner. (Id.)

### 2. Dimitri

During the 2010-2011 school year, 95% of Dimitri's goals were marked as "Progressing Satisfactorily" throughout the entire school year, indicating that he was on track to meet his goals. (Id. ¶ 242.) However, Dimitri's June progress report at the end of the school year stated that he only met seven of his forty-two goals. (Id. ¶¶ 243, 246.) When Donus requested a corrected progress report, she was informed that it was impossible since "everyone was now on vacation for the summer." (Id. ¶ 247.) At Dimitri's 2012 year-end evaluation, a representative of the district, Dr. Kelly Spagnola, admitted that Dimitri's IEP had been marked incorrectly for the prior two years. (Id. ¶ 249.) As a result, Dimitri did not make any social or emotional progress for those two school years. (Id. ¶ 250.) Despite this lack of progress, no additional programs or plans were put in place by Defendants to assist Dimitri. (Id.)

In March 2013, Donus learned that the District disseminated a form to the parents of the general education students at the beginning of the 2012-2013 school year, requesting the child's interest in either the band or the chorus. (Id. ¶ 252.) The parents were then required to sign the form and return it with a check if their child chose to participate in either activity. (Id.) However, neither Donus nor any of the other parents in Dimitri's self-contained classroom received this form. (Id.) It was not until Donus requested in March 2013 that Dimitri be permitted to participate in either the band or the orchestra that he was given the opportunity to do so. (Id.)

C. <u>Katie Collins</u>

Katie Collins ("Katie") was diagnosed with Autism when she was four years old. (<u>Id.</u> ¶ 256.) Katie began school in the District in September 2001 at the age of nine. (<u>Id.</u>)

For the 2001-2002 school year, Defendants did nothing to address Katie's behavior, either at school or at home with additional services. (<u>Id.</u> ¶ 257.) No BIP was developed for Katie, she was given no social skills training and no Applied Behavioral Analysis ("ABA") was utilized by Defendants. (<u>Id.</u> ¶ 258.) The same is true for the 2002-2003, 2003-2004 and 2004-2005 school years. (<u>Id.</u> ¶¶ 259-61, 264-65.)

At the beginning of the 2004 school year, Katie was not provided with a 1:1 aide for the first two weeks of school, even though her IEP indicated that she needed one. (<u>Id.</u> ¶ 262.) While Katie was eventually given a 1:1 aide, Defendants attempted to later reduce her aide from a full-day to only being available to Katie during certain classes. (<u>Id.</u> ¶ 268.)

Throughout her schooling in the District, Katie was never offered AIS; nor was Katie's mother, Diane Collins ("Collins"), even advised of its availability, despite the fact that Katie qualified for AIS as early as the fourth grade. (<u>Id.</u> ¶ 298.) Although Collins wrote several letters and reached out to Defendants several times regarding obtaining AIS for Katie, no such services were provided.[8] (<u>Id.</u> ¶¶ 303-05, 319.) Katie was similarly not provided with a general education reading support class, despite Collins's numerous requests for Defendants to address Katie's reading comprehension. (<u>Id.</u> ¶¶ 306-07.)

---

[8] Although Defendants eventually agreed to provide Katie with AIS, they advised Collins that they only way to do so was to reduce Katie's Math credit by half so that she would alternate reading and math every other day. (<u>Id.</u> ¶ 317.) Collins did not find this plan acceptable and voiced her concerns to the District by letter dated November 10, 2008. (<u>Id.</u> ¶ 319.)

In November 2008, Collins filed a complaint with the Office of Civil Rights. (Id. ¶ 320.) In July 2009, Collins requested a Due Process hearing. (Id. ¶ 329.) During the hearing, Defendants agreed to provide Katie with the services Collins had been requesting but had previously been denied and Collins's complaint was resolved prior to the completion of the hearing. (Id. ¶ 329.) Collins filed another Due Process complaint in July 2012. (Id. ¶ 360.) This complaint, too, was resolved among the parties. (Id. ¶ 361-62.)

Plaintiffs commenced this action on January 28, 2013 and amended their Complaint on June 5, 2013, asserting claims for discrimination in violation of 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (the "ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, as well as claims for retaliation, pursuant to the ADA and the Rehabilitation Act.

## DISCUSSION

### I. Legal Standard

Defendants move for a judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), on the following grounds: (1) that the Court lacks subject matter jurisdiction because Plaintiffs failed to exhaust their administrative remedies and (2) that the Amended Complaint fails to state a claim for relief because the statutes of limitation have expired. Where, as here, a defendant is using a Rule 12(c) motion to challenge the Court's subject matter jurisdiction, "the court should apply the same standard as that applicable to a motion under Rule 12(b)(1)." United States v. New Silver Palace Restaurant, Inc., 810 F. Supp. 440, 441 (E.D.N.Y. 1992) (citation omitted).

A district court should dismiss a case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) when the court "lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Fed. R. Civ. P. 12(b)(1). When reviewing a motion to dismiss for lack of jurisdiction, the Court "must accept as true all material factual allegations in the complaint, but [it is] not to draw inferences from the complaint favorable to Plaintiff[]." Wood v. GMC, No. CV 08-5224, 2010 U.S. Dist. LEXIS 96157, at *9 (E.D.N.Y. Aug. 23, 2010) (quoting J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004)) (additional citation omitted) (alteration in original). The Court may also "consider evidence outside the pleadings, such as affidavits" when determining whether it has jurisdiction. Stoothoff v. Apfel, No. 98 Civ. 5724, 1999 U.S. Dist. LEXIS 10459, at *1 n.1 (S.D.N.Y. July 7, 1999) (citing cases). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Wood, 2010 U.S. Dist. LEXIS 96157, at *9 (quoting Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005)).

When evaluating a motion for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), the court employs the same standard as that for a motion to dismiss under Rule 12(b)(6). See Troni v. Holder, No. 09 Civ. 10239, 2010 U.S. Dist. LEXIS 79670, at *4-5 (S.D.N.Y. July 29, 2010) (citing Patel v. Contemporary Classics, 259 F.3d 123, 126 (2d Cir. 2001)); Astrazeneca AB v. Apotex Corp., No. 01 Civ. 9351, 2010 U.S. Dist. LEXIS 58044, at *9 (S.D.N.Y. June 8, 2010) (citing Irish Lesbian & Gay Org. v. Guiliani, 143 F.3d 638, 644 (2d Cir. 1998)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007)). "Facial plausibility" is achieved when the "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556). As a general rule, the court is required to accept as true all of the allegations contained in the complaint, see Iqbal, 129 S. Ct. at 1949; Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007), and to "draw[] all reasonable inferences in the plaintiff's favor." Troni, 2010 U.S. Dist. LEXIS 79670, at *5 (quoting In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007)).

"Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." FDIC v. M/V "Ville D'Aquarius", No. 08 Civ. 8997, 2009 U.S. Dist. LEXIS 97349, at *8 (S.D.N.Y. Oct. 20, 2009) (quoting Sellers v. M.C. Floor Crafters Inc., 842 F.2d 639, 642 (2d Cir. 1988)). Although the court is generally limited to the facts alleged in the complaint when determining a Rule 12(c) motion, the court may also refer "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit." Brass v. Am. Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (citation omitted).


II.   Exhaustion of Administrative Remedies

Defendants assert that Plaintiffs' Section 1983, ADA and Rehabilitation Act claims fail as a matter of law because plaintiffs chose not to exhaust their administrative remedies before commencing this action. In response, plaintiffs argue that exhaustion should be excused here on

the grounds of futility.

The purpose of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. (the "IDEA"), is to provide disabled children with a "free appropriate public education" in the least restrictive appropriate environment. Polera v. Bd. of Educ., 288 F.3d 478, 481 (2d Cir. 2002) (citing 20 U.S.C. §§ 1400(d)(1)(A), 1401(8), 1411(a)(1) & 1412 (a)(5)(A)). Under the IDEA, parents of disabled students are guaranteed an array of procedural safeguards, including the right "to request a due process hearing in order to present complaints as 'to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education.'" Cave v. East Meadow Union Free Sch. Dist., 514 F.3d 240, 244 (2d Cir. 2008) (quoting 20 U.S.C. § 1415(b)(6)(A)).

New York has a "two-tier administrative system" for review of individual education programs:

> First, an impartial hearing officer is selected from a list of certified officers and appointed by the local board of education or the competent state agency to conduct the initial hearing and issue a written decision. That decision can then be appealed to a state review officer of the New York Education Department.

Cave, 514 F.3d at 244 (citing Heldman ex rel. v. Sobol, 962 F.2d 148, 152 (2d Cir. 1992)) (additional citation omitted). Only after both of these administrative procedures have been exhausted can a party file suit in either federal or state court. See Cave, 514 F.3d at 245 (citing 20 U.S.C. § 1415(i)(2)(A)); Polera, 288 F.3d at 483 ("Although the IDEA provides for a federal cause of action . . ., it imposes a broadly applicable requirement that plaintiffs first exhaust administrative remedies."); Buffolino v. Bd. of Educ., 729 F. Supp. 240, 244 (E.D.N.Y. 1990) ("If a party has exhausted both . . . administrative remedies, namely the impartial hearing and the

-15-

administrative appeal, and the party remains aggrieved, a civil lawsuit may be commenced in either state court or federal district court . . . ."). "[F]ailure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction." Polera, 288 F.3d at 483 (citing Hope v. Cortines, 69 F.3d 687, 688 (2d Cir. 1995)).

"Importantly, complainants must overcome this significant procedural hurdle not only when they wish to file suit under the IDEA itself, but also whenever they assert claims for relief available under the IDEA, regardless of the statutory basis of their complaint." Cave, 514 F.3d at 246 (emphasis in original). As the IDEA explicitly mandates:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C. § 791 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l) (alteration in original) (emphasis in original). Accordingly, plaintiffs are also required to exhaust their administrative remedies before filing suit under the ADA, the Rehabilitation Act and Section 1983 if the action seeks relief that is available under the IDEA. See Cave, 514 F.3d at 248-49; Polera, 288 F.3d at 483; Buffolino, 729 F. Supp. at 245. "[R]elief that is also available" under the IDEA has been broadly construed "'to mean relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers.'" Polera, 288 F.3d at 483, 488 (quoting Charlie F. v. Bd. of Educ., 98 F.3d 989, 992 (7th Cir. 1996)).

Plaintiffs here solely seek monetary damages - both compensatory and punitive. There is no request for injunctive relief in the Amended Complaint. In Polera v. Bd. of Educ., 288 F.3d 478 (2d Cir. 2002), the Second Circuit specifically found that "monetary damages are not available under the IDEA" because its purpose "is to provide educational services, not compensation for personal injury, and a damages remedy . . . is fundamentally inconsistent with this goal." Id. at 486. However, the Circuit went on to conclude that a prayer for damages does not enable a plaintiff to "sidestep the exhaustion requirement of the IDEA," emphasizing that the "theory behind the grievance may activate the IDEA process, even if the plaintiff wants a form of relief that the IDEA does not supply." Id. at 488 (quotation omitted). Courts in the Second Circuit have required plaintiffs to exhaust their administrative remedies even where damages were unavailable through the administrative process, finding that merely tacking on a request for money damages does not permit a plaintiff to evade the IDEA's exhaustion requirement. See id. at 487 (collecting cases).

All of the claims contained in the Amended Complaint relate to the "identification, evaluation, or educational placement" of the minor Plaintiffs or their treatment by school personnel because of their disabilities, and "therefore these claims all invoke [Plaintiffs'] right to a free appropriate public education." Baldessarre v. Monroe-Woodbury Cent. Sch. Dist., 820 F. Supp. 2d 490, 505 (S.D.N.Y. 2011). Accordingly, these claims "are squarely within the ambit of the IDEA."[9] Id. Where, as here, a full remedy is available at the time of injury, a disabled

---

[9] "Because all of Plaintiffs' claims of discrimination relate to the interplay between [the minor Plaintiffs] disabilit[ies] and [their] education, whether the Amended Complaint adequately alleges facts sufficient to state a claim under [the ADA or the Rehabilitation Act] is irrelevant." Baldessarre, 820 F. Supp. 2d at 505 (citing cases).

student claiming deficiencies in his or her education may not ignore the administrative process, then later sue for damages." Polera, 288 F.3d at 488. Accordingly, absent an applicable exception, discussed infra, Plaintiffs were required to exhaust their administrative remedies under the IDEA prior to commencing this action.

III.    The Futility Exception

The Second Circuit has held that the IDEA's exhaustion requirement will be excused "in situations in which exhaustion would be futile." Coleman v. Newburgh Enlarged City Sch. Dist., 503 F.3d 198, 205 (2d Cir. 2007) (quoting Polera, 288 F.3d at 488.) To show futility, "a plaintiff must demonstrate that 'adequate remedies are not reasonably available' or that 'the wrongs alleged could not or would not have been corrected by resort to the administrative hearing process.'" Intravaia v. Rocky Point Union Free Sch. Dist., 919 F. Supp. 2d 285, 292 (E.D.N.Y. 2013) (quoting Coleman, 503 F.3d at 205) (additional citations omitted). Specific examples include where defendants "failed to implement services that were specified or otherwise clearly stated in an IEP," Kalliope R. v. New York State Dep't of Educ., 827 F. Supp. 2d 130, 138 (E.D.N.Y. 2010) (quoting Polera, 288 F.3d at 489), or where "the problems alleged are 'systemic violations' that cannot be addressed by the available administrative procedures." Kalliope R., 827 F. Supp. 2d at 138 (quoting J.S. v. Attica Cent. Sch. Dist., 386 F.3d 107, 113 (2d Cir. 2004)). Plaintiffs bear the burden of demonstrating futility. See Polera, 288 F.3d at 488 n.8 (citing Honig v. Doe, 484 U.S. 305, 327 (1988)).

Here, Plaintiffs do not dispute that they were required to exhaust their administrative remedies before filing the within lawsuit. Rather, Plaintiffs argue that exhaustion should be

excused on the basis of futility. According to Plaintiffs, "the facts alleged in the Amended Complaint demonstrate that the problems [in the District] were 'systemic' in nature, and that Defendants failed to implement Plaintiffs' IEPs." (Pl. Mem. of Law 15.)

A.    Systemic Violations

"The Second Circuit has found systemic violations [of the IDEA] where the complaint alleges 'wrongdoing that is inherent in the program itself and not directed at any individual child.'" Scaggs v. New York State Dep't of Educ., No. 06-CV-0799, 2007 WL 1456221, at *6 (E.D.N.Y. May 16, 2007) (quoting J.S., 386 F.3d at 113). Where a school district "completely fails to implement the procedures set forth in the IDEA, systemic violations that cannot be cured by administrative procedures are present." Scaggs, 2007 WL 1456221, at *6 (collecting cases). In such cases, "the Second Circuit has consistently distinguished the problem of inadequate educational programs and facilities, which constitute systemic violations to be addressed by the federal courts, from technical questions of how to define and treat individual students' learning disabilities, which are best addressed by administrators." Id. at *7 (citing Jose P. v. Ambach, 669 F.2d 865, 870 (2d Cir. 1982)).

While Plaintiffs claim that the Amended Complaint "contains sufficient allegations which demonstrate that Defendants' discriminatory acts and failures constituted 'systemic violations,'" (Pl. Mem. of Law 16), "the mere fact that certain allegations in the Complaint assert that the rights of 'other similarly situated special needs students' were also violated does not automatically turn utilization of the administrative hearing process into an act of futility." Intravaia, 919 F. Supp. 2d at 295. In contrast to those cases in which systemic violations excusing exhaustion have been found, this action involves the complaints of four individual

-19-

students concerning the District's failure to construct and implement adequate IEP's for those specific students. Despite Plaintiffs' attempt to evade exhaustion of their administrative remedies by claiming systemic violations, the few conclusory allegations contained in their Amended Complaint fail to demonstrate a "district-wide total failure to construct and implement IEPs for special needs students." Dallas v. Roosevelt Union Free Sch. Dist., 644 F. Supp. 2d 287, 295 (E.D.N.Y. 2009).

Accordingly, Plaintiffs were required to use the state administrative procedures prior to commencing this action and they have failed to demonstrate that the exhaustion requirement should be excused on the grounds of systemic violations.

B.    Failure to Implement

Also included in the futility exception are "cases in which the complaint alleges that 'a school has failed to implement services that were specified or otherwise clearly stated in an IEP.'" Piazza v. Florida Union Free Sch. Dist., 777 F. Supp. 2d 669, 682 (S.D.N.Y. 2011) (quoting Polera, 288 F.3d at 489). However, the Second Circuit has repeatedly noted that "this 'failure to implement' category of claims is a narrow one, and that courts must 'closely examine a plaintiff's claims before concluding that they involve nothing more than 'implementation' of services already spelled out in an IEP.'" Piazza, 777 F. Supp. 2d at 682 (quoting Polera, 288 F.3d at 489) (additional citation omitted); see also Baldessarre, 820 F. Supp. 2d at 504 n.14 ("The futility exception . . . applies narrowly to cases in which the complaint alleges that a school has failed to implement services that were specified or otherwise clearly stated in an IEP."). "This is because plaintiffs could defeat the purposes of the exhaustion requirement by reframing complaints they have regarding the content of the program provided their child as claims

-20-

regarding 'implementation.'" Piazza, 777 F. Supp. 2d at 682 (citing Polera, 288 F.3d at 489). "A plaintiff's assertion that her claim relates solely to implementation does not make it so." Gardner v. Uniondale Public Sch. Dist., No 08-CV-847, 2008 WL 4682442, at *12 (E.D.N.Y. Oct. 21, 2008) (quoting Polera, 288 F.3d at 489).

Plaintiffs assert that they should be excused from the exhaustion requirement because Defendants failed to implement specified services in Michael Donus's and Katie Collins's IEPs - specifically, that the District failed to provide Michael with speech or occupational therapy from January to June 2013, while Michael was being home schooled, and that Katie was not provided with a 1:1 aide for the first two weeks of the 2004 school year. (Am. Compl. ¶¶ 225, 262.) As a threshold matter, such an exhaustion exception would only apply to Michael and Katie and would not exempt Dimitri Donus or Dayna Stropkay from fulfilling their administrative exhaustion requirement.

With respect to Michael and Katie, while Plaintiffs allege that their claims should be construed as "failure to implement" claims, most of the claims in the Amended Complaint do not allege deprivation of a service that was either specified or otherwise stated in an IEP, but rather they challenge the adequacy of the services provided, as well as the content of the IEPs themselves. See Piazza, 777 F. Supp. 2d at 683 (finding failure to implement exception inapplicable). "Claims that in substance challenge the adequacy and appropriateness of the services provided to a disabled student are best resolved (or at least presented) administratively." Id. at 682 (citation omitted).

Moreover, "a singular failure to comply with a provision of an individualized plan is not a failure to implement within the meaning of the futility exception." Gardner, 2008 WL 4682442,

at *10. Here, if, as Plaintiffs' allege, Defendants did fail to provide Michael with speech or occupational therapy from January to June 2013 and Katie with a 1:1 aide for the first two weeks of the school year, such failures are isolated incidents that do not call into question the District's implementation of Michael's and Katies' IEPs as a whole.

Accordingly, the Court finds that Plaintiffs' have failed to demonstrate that they should be excused from exhausting their administrative remedies under the failure to implement exception. Because Plaintiffs have failed to exhaust their administrative remedies prior to commencing litigation, the Court lacks subject matter jurisdiction over the action.[10]

## CONCLUSION

For the foregoing reasons, Defendants' motion for a judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c) is granted and Plaintiffs' Amended Complaint is dismissed in its entirety. The Clerk of the Court is directed to terminate the motion filed under docket entry number 16 and to thereafter close the file in this case.

---

[10] This applies to Plaintiffs' retaliation claims as well as their discrimination claims. Although Plaintiffs argue that their retaliation claims could not have been administratively remedied under the IDEA, it is clear from the Amended Complaint that Plaintiffs' retaliation claims arise out of disputes with the District over the minor Plaintiffs' educational programs. As a result, "the Plaintiffs' retaliation claims fall within the ambit of the IDEA" and are therefore "subject to the IDEA's exhaustion requirement." R.S. v. Bedford Cent. Sch. Dist., No. 7:10-CV-0613, 2011 WL 1404969, at *4 (S.D.N.Y. Mar. 17, 2011).

SO ORDERED:

s/ Leonard D. Wexler
_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Central Islip, New York
December 12, 2013